## Howell et al., Appellants, *v.* Miller.

*Real estate—Devise—Extent—Ejectment.*

A testator devised to his two daughters the "use, improvement and income of my messuage, tenement or brick dwelling house, with the appurtenances and lot of ground thereunto belonging" for and during the lifetime of the said daughters and the survivor thereof.

In an action of ejectment to determine the extent of the devise, judgment of nonsuit was properly entered, where no evidence was produced, on the part of the plaintiffs, from which to find that the testator had done anything which indicated an intention to devote to the use of the dwelling or the dwellers therein, any part of his farm north of a certain fence, which he had for many years maintained along the northern line of his dwelling house lot.

Argued March 13, 1923.   Appeal, No. 223, Oct. T., 1922, by plaintiff, from judgment of C. P. Northampton Co., Nov. T., 1919, No. 43, refusing to strike off compulsory nonsuit in the case of Theodore H. Howell, Harriet B. Howell, Maria B. Howell, Mildred A. Howell, Theodore T. Howell, Thomas S. Howell and John H. Danner in their own right and in right of the heirs and legatees of Theodore Howell, deceased, and Daniel Howell, Naomi Rock, John T. Howell, Dr. John T. Howell, Harold Howell, Joseph A. Howell, Susie L. D. Smith, Mary L. D. Bull, Harriet M. D. Ritter and Samuel Howell, real owners and claimants of the land sought to be recovered, v. Henry A. Miller.   Before ORLADY, P. J., PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ.   Affirmed.

Action of ejectment to determine title to lot of land on east Twenty-first Street in the Borough of Northampton.   Before McKEEN, J.

282     HOWELL et al., Appellants, v. MILLER.

The facts are stated in the opinion of the Superior Court.

The court entered a compulsory nonsuit which it subsequently refused to strike off. Plaintiffs appealed.

*Error assigned,* among others, was the order of the court.

*Everett Kent,* and with him *Thomas D. Danner,* for appellants.—The court erred in refusing to strike off nonsuit: Hineman v. Matthews, 138 Pa. 204, 27 W. N. C. 49, 38 P. L. J. 145; Cohen v. Phila. & R. R. R. Co., 211 Pa. 227, 229; Jacques v. Fourthman, 137 Pa. 428; Bastian v. Phila., 180 Pa. 227.

The land in question was appurtenant to the dwelling house and comprehended in the devise: 40 Cyc. 1532, 1533; Piper's App., 73 Pa. 112; Blaine's Lessee v. Chambers, 1 S. & R. 169; Long's Est. (No. 1), 46 Pa. Superior Ct. 474; Grub v. Guilford, 4 Watts 244; Cope v. Grant, 7 Pa. 488-491; 17 C. J. 401; section 66.

*William H. Schneller,* for appellee.—The plaintiff failed to establish by the evidence the right of title and the right of possession to the disputed premises: Corpus Juris, vol. 4, 1466; Hanby v. Bailey, 51 Pa. Superior Ct. 244, 250; Bannett v. Bell, 82 Mo. 110, 114; Howell v. McCoy, 3 Rawle 256; Seitz v. Pennsylvania Railroad Company, 272 Pa. 88; Rodgers v. Pittsburgh, etc., Ry. Co., 255 Pa. 462, 466.

OPINION BY PORTER, J., July 12, 1923:

The plaintiffs in this action of ejectment seek to recover of the defendant possession of a lot of ground in the Borough of Northampton. The court below, upon the trial, deemed the evidence submitted by the plaintiffs insufficient to warrant a verdict in their favor and entered a compulsory nonsuit, which it subsequently re-

fused to take off, which ruling the plaintiffs here assign for error.

Both parties to this litigation claim under the provisions of the will of Theodore H. Howell, deceased, who died seized in 1918. The plaintiffs contend that the lot in question was a part of the lot of ground belonging to the dwelling house of the deceased, which passed under a clause of the will devising "unto my two daughters, Maria B. and Harriet B., the use, improvement and income of my messuage, tenement or brick dwelling house, with the appurtenances and lot of ground thereunto belonging, situate on the north side of twenty-first street, in the Borough of Northampton,......to have and to hold the same unto my said daughters and the survivor of them, for and during their natural lives, and after the death of both my daughters aforesaid, the above described mansion house and the furniture remaining therein, shall revert back to my estate, and then be sold by my executors, or the survivor of them, for the best price that can be obtained for the same, and the proceeds arising therefrom shall be divided among my surviving heirs, in the manner as provided by law." The daughters named are among the parties plaintiff in this proceeding. If the lot in question is a part of the lot belonging to the dwelling house, they are entitled to possession, and no question is raised as to the propriety of the other plaintiffs, who are also heirs of the deceased, joining in this proceeding. The will ordered and directed all his remaining real estate to be sold and converted into money as soon as conveniently might be done after his decease, and authorized and empowered his executors and the survivor of them to sell at either public or private sale and to execute deeds conveying to the purchasers title in fee simple. The surviving executor sold at public sale, the regularity of which is not questioned, a tract containing about nine and a half acres of land, which included the lot in question, for the consideration of five thousand dollars, and said purchase money was paid by

the defendant. It may here be observed that the executor who thus conveyed the tract, including this lot of ground, to the defendant, now joins as a party plaintiff in this proceeding, asserting that he had no right to thus sell and convey to the defendant.

The evidence produced by the plaintiffs disclosed that the testator owned a farm of considerable extent, which he cultivated and upon which he lived, his dwelling house being situated on the north side of Twenty-first Street, in the Borough of Northampton; at the west side of the dwelling house lot was an alley upon which the barn fronted and by which access was had to the fields lying to the north and east of the dwelling house lot; the farm extended to a considerable distance north of the dwelling house lot as well as eastward thereof. Lincoln Avenue was not in existence during the lifetime of the testator, but was opened subsequently to his death along the eastern line of the dwelling house lot, thus now leaving that lot at the corner of said avenue and Twenty-first Street. The farm, including the dwelling house lot, was the home of the testator, he cultivated it, growing hay and various kinds of grain and hauled the products of his fields to his barn and corncrib, there stored them and subsequently disposed of them as he saw fit. He had the unquestioned right to use the entire property in any manner that his convenience suggested. Evidence was properly admissible to show the condition of the property to which the will was to be applied and the uses to which the testator had devoted the several parts of that property, for the purpose of determining what was to pass under the devise to the daughters of the "brick dwelling house, with the appurtenances and lot of ground thereunto belonging."

The evidence showed that shortly after the dwelling house was erected the testator had caused to be erected a fence around the lot upon which the house stood. The controversy in this case is as to the proper location of the northerly line of the dwelling house lot. The testimony

produced by the plaintiffs clearly established that for many years prior to the death of the testator there had been a paling fence along the northerly line of the lot actually enclosed with the dwelling house extending back westerly from the point where Lincoln Avenue has since been opened to the corner of a building which the witnesses called a chicken barn, the northerly side of which was a continuation of the fence line, thus leaving that building to the south of the line; continuing on westerly there was another small shed (the use to which this building was devoted was not developed by the evidence); still further west was a corncrib, which stood entirely north of the continuation of the fence line. One of the plaintiffs, a son of testator, testified that he had assisted in building this fence and that it was put where his father had directed it to be constructed. Another witness for plaintiff testified, upon his examination by plaintiffs' counsel and notwithstanding the objection of the defendant, that he had asked the testator why he built this fence in so far and that the testator had said "He didn't want in the yard of his home the fire place and the chicken-raising business and the wood-chopping business, and that he put that there because he wanted all that outside of his yard." It thus appeared upon the plaintiffs' own showing that the testator had caused this fence to be erected along the northerly line of the dwelling house lot intentionally and for the very purpose of excluding from that lot certain things which he did not think desirable to be there done.

The plaintiffs contend, however, that the line of the dwelling house lot should be fixed parallel to this fence line and twenty-nine feet to the north thereof, because of the uses to which the testator had devoted that strip of ground. The land north of the fence was an open field of considerable extent, which the testator had used in his farming operations, rotating in the ordinary manner the growing of different varieties of grain during successive years. The only buildings in that field were the

corncrib and a small shed, both of which stood immediately north of the continuation of the line of the paling fence, the south side of those buildings rendering a fence unnecessary at that point. The corncrib was used exclusively for the purpose of storing the corn which had been grown and ripened upon the fields of the farm. The small shed immediately adjoining the corncrib and, as the plaintiffs did not produce evidence tending to show for what purposes that shed had been used, we cannot assume that it was used for a purpose necessary to the house as a dwelling place; it may have been used for the purpose of storing agricultural implements. When the owner of an entire tract of land, the several parts of which are devoted to distinct uses, so treats it that one part must be subject to a way or other use in order that another part may be beneficially enjoyed, it may be that if he sells the property in connection with which the way is used, the use of the way having been continuous, open and apparent, the way would pass as an appurtenance of the grant, without an express covenant to that effect. But this corncrib and shed were not shown to have been used in connection with the dwelling house, and so far as the corncrib was concerned, the evidence clearly established that it was used for storing the corn grown upon the farm, and no other corn was ever there deposited. There was upon the strip of ground and quite close to the paling fence what plaintiffs' witnesses called a fire place, which merely consisted of old railroad ties, laid one upon another on three sides of a parallelogram and only extending high enough to protect the fire from the wind, in the space so protected two stakes were driven and a bar laid across between them, which when in use supported two kettles, used when the butchering was done, and sometimes they washed there in good weather. It did not appear to what extent this testator carried on the business of there slaughtering animals. He may, so far as the evidence indicates, have slaughtered animals, cut up the carcasses and sold them to the public, which would

certainly not be a use in connection with the dwelling. Let it be assumed, however, that he slaughtered only cattle, sheep or hogs which were the stock of the farm; that would mean nothing more than that he prepared for his own use or sale the products of the farm. There was nothing in this to indicate to the defendant, who purchased the land from the executor of the testator, that the deceased had fixed upon this land distinct marks that it was to be used in connection with the dwelling house rather than the farm. The only other structures which ever were upon this strip of ground were a number of quite small chicken houses, which were the temporary homes of the little chickens which the farmer raised. There is nothing in the evidence to indicate whether these were incubator chickens or chicks which were raised in the manner common with farmers. We all know how this particular branch of farming was formerly practiced; the hen was confined in the little coop and there were openings through which the little chicks could go out and forage. The little coops were for the protection of the chickens and not for the comfort of the people who dwelt in the farmhouse. It is not unusual to keep such little coops reasonably near the dwelling house lot, in order that the farmer may better protect the young chickens from the incursions of their natural enemies. There was nothing permanent in the character of these structures, and one of the witnesses for plaintiffs testified that the little coops had at one time been removed from this location for the reason that disease had developed among the chickens.

The only remaining reason urged by the plaintiffs for holding that this strip of ground was part of the dwelling house lot is that the evidence disclosed that this strip of ground had not been ploughed nor had crops been grown upon it, but that it was used as a driveway. It might be sufficient to say, so far as this matter is concerned, that even if it was a driveway that did not vest the title to the land in the owners of the dwelling house

lot, for it would certainly be unreasonable to hold that it was the intention of the testator to cut off from the owner of the farm access to the only corncrib upon the entire tract. If the situation were such as to warrant a finding that the owner of the dwelling house should have a right-of-way over this strip of ground, the remedy for an intrusion upon that right would not be an action of ejectment, for the owner of the farm also has the right to use that driveway, but the evidence was not sufficient to warrant a finding that the testator had intended the use of that strip of ground as a means of access to the house. The evidence clearly established that the driveway was used for the purpose of hauling from the fields to the eastward the crops there grown. The teams bringing in the corn from those fields proceeding along the strip of ground to the north side of the corncrib, and the corn was shoveled into the crib. The wheat, rye, oats and hay, all of which the evidence indicates were produced, were hauled along this strip of ground to the alley. The evidence does not disclose where the threshing was done, or whether those grains were hauled over the strip of ground in the sheaf, or if the threshing was done in the fields and merely the grain hauled over this driveway; nor does it disclose whether those crops were hauled to the barn or taken out through the alley and sold away from the premises. This driveway did not extend to any highway or definite place to the eastward, for Lincoln Avenue was not then in existence. In fact, there was no definite location of the driveway to the eastward of the dwelling house, for one of the plaintiffs testified that in driving in from the fields they did not take any fixed route, but merely took the shortest course over the land to the corncrib. There was not a scintilla of evidence which would have warranted a finding that this driveway was used for any other purpose than for the convenient operation of the farm, as a farm, and taking the products thereof to the places where they were stored or sold. The evidence did not warrant a finding that the

testator had, in his lifetime, done anything which indicated an intention to devote to the use of the dwelling house or the dwellers therein any part of his farm north of the fence which he had for many years maintained along the north line of his dwelling house lot. The court did not err in refusing to take off the judgment of nonsuit.

The judgment is affirmed.